[Civ. No. 8228. Third Dist. Jan. 29, 1954.]

CHARLES BOOTS, Appellant, v. VIRGIL HARLEY POTTER et al., Respondents.

CHARLES BOOTS, Plaintiff and Appellant; MARJORIE CUMMINGS et al., Plaintiffs and Respondents, v. VIRGIL HARLEY POTTER et al., Defendants and Respondents; DOUGLAS LEE et al., Defendants and Appellants.

C. Ray Robinson, R. A. McCormick, William B. Boone and Murphy & Adams for Plaintiff and Appellant and Plaintiffs and Respondents.

Stammer, McKnight and Barnum for Defendants and Appellants.

Hansen & Barstow and C. O. Hansen for Defendants and Respondents.

PAULSEN, J. pro tem.*—As the result of an automobile accident which occurred on January 19, 1951, at the intersection of Highway 152 and County Road 10-N in Madera County, Charles Boots received personal injuries and his wife, Mary Boots, was killed. One action was filed by Charles Boots to recover for his own injuries and another by Charles Boots and the children of Charles and Mary to recover damages for Mary's death. The same defendants were named in both actions.

The cases were consolidated for trial and are submitted here on the same record. The defendants prevailed in the first action and Charles Boots has appealed from the judgment therein. In the second action Charles Boots was again denied relief against all defendants, but judgment was given against them in favor of the children of Charles and Mary. Charles Boots and the defendants Lee and the Thomas Construction Company have appealed from the judgment in that action.

Highway 152 runs generally east and west and County Road 10-N runs north from it beginning at the point where the accident occurred. On the afternoon of January 19th Boots, accompanied by his wife, was driving a pickup truck in an easterly direction on the highway and while starting to turn north on the county road was struck by a large truck driven by the defendant Virgil Harley Potter, who had been some distance behind him and was also driving easterly along the highway. It is admitted that Potter was an employee of the defendant Eudy and was acting within the scope of his employment.

The defendant Thomas Construction Company had a contract to repair a bridge on the highway at a point about one-fourth of a mile east of the intersection of the two roads. The president of the company testified that on the afternoon of January 19th flood waters started to come over the bridge and he was instructed by the state inspector on the work to station a flagman outside the limits of the construction area in order to detour the traffic around the bridge by way of the county road. It was decided that heavy trucks would be able to cross the bridge notwithstanding the presence of

---

*Assigned by Chairman of Judicial Council.

the water and that light trucks and passenger vehicles should be detoured around the bridge by means of the county road.

The defendant Lee, who had no prior experience in that kind of work, was assigned to the task of flagging at the intersection. He was told to stop all vehicles coming from the west; to detour the light ones around the bridge by way of the county road and to warn the heavy ones of the water on the bridge and then let them proceed east on the main highway.

No special detour sign was placed at the intersection and, except for the presence of the flagman and such information as he might give them, there was nothing to warn motorists approaching from the west that they would not be able to proceed directly along the highway or turn to the north as they pleased. However, at the time of the accident and for some time prior thereto three standard warning signs furnished by the state for use in construction zones were set up on the highway, facing west. To a motorist approaching the intersection from the west the first sign that would appear was a "Slow" sign set up 500 feet west of the intersection; next was a sign reading, "Danger, Bridge Under Construction," placed 200 feet west of the intersection; and at the intersection was a sign marked "Construction Zone, Drive Carefully."

Lee testified that he started flagging about 2:30 p.m. that day and at first stood in the middle of the highway, wearing a red coat and carrying a red flag in his hand. One of the first cars to approach refused to stop and he was almost run over. He stated that a position in the middle of the road under the conditions that then existed, where traffic was also coming from the county road and proceeding toward the west, was too dangerous and he took up a new position on the south shoulder or south edge of the highway.

Boots testified that he traveled the two roads frequently, was familiar with the general situation, and knew that No. 152 was a main highway normally carrying heavy traffic; that as he approached the intersection there were no other vehicles in sight; that he first observed the three warning signs when he was between a quarter and a half mile west of the intersection and at that time he saw the flagman standing on the shoulder of the highway; that he came to a stop and the flagman told him to go north on the county road to a certain point and then turn right and south again to the main highway; that he was not told that heavy trucks were being permitted to

continue along the highway and over the bridge and thought that all traffic was being detoured by way of the county road; that while he was talking to the flagman he had his hand out to show he was stopped and through the rearview mirror observed three or four cars come to a stop behind him; that after telling him to go north the flagman motioned with his flag in the direction of the county road and said "All right"; that when that statement was made he immediately shifted into low gear and turned directly across the highway toward the county road, but gave no signal of any kind and did not look back to see if anyone was coming along the highway from behind him. After stating that he knew other cars were stopped behind him he testified: "I never paid any attention after, when I got ready to go, that was the end of the road for me, the same as a turn there, I didn't know."

As Boots started his turn into the county road the left rear fender of his pickup was struck by the Potter truck which was then in the north lane of the highway proceeding east and attempting to pass the cars that had stopped. Boots admitted that he did not see the Potter truck until he was hit and did not hear Potter blow his horn. Lee admitted that he did not tell Boots that heavy trucks were being permitted to continue along the main highway to the bridge.

Potter had driven his truck from Texas to the coast several days before the accident over the same road and on January 19th was returning to his home. He admitted that he had driven over the same road several times and knew that there were several roads leading into the highway in that area and had previously noticed the county road in particular, but did not regard the place where the accident occurred as an intersection.

Lee testified that at all times during his conversation with Boots and until after the accident he was standing on the south shoulder of the highway and that he talked to Boots through the right window of the pickup where Mrs. Boots was seated; that from the time the Boots pickup stopped he held the flag down at his side while talking and did not raise it above his head or wave it as the cars following the Boots pickup came to a stop; that he did not see the Potter truck in time to try to stop it or to try to warn Boots; that he was looking at the car immediately behind the Boots pickup and did not see the Potter truck until Potter sounded his horn, at which time Potter's truck was in the north lane about two car lengths from where Lee was standing.

It is clear from the verdicts that the jury considered both Potter and Lee guilty of negligence and Boots guilty of contributory negligence.

### THE APPEALS OF CHARLES BOOTS

The only questions raised on the appeals by Boots involve the propriety of giving or refusing to give instructions on the subject of contributory negligence.

There are many assignments of error on these appeals and in order to understand them it is necessary to deal first with a pivotal instruction given at the request of Lee and Thomas Construction Company as follows:

"In this case, there is a dispute as to what was said by and what were the motions made by the flagman, Douglas Lee, immediately before the accident. It is for you to determine this question from the evidence.

"However, regardless of your decision on this question, you are instructed that a person who operates a vehicle on a public highway has no right to rely completely upon the comments or instructions of any other person, and regardless of any such comments or instructions or motions, it was the duty of the Plaintiff, Charles Boots, to exercise ordinary care for his own safety and the safety of others on the highway, and to exercise such care before he made and while he was making the turn immediately before and at the time of the accident."

No case has been called to our attention and we have found none which goes so far as to hold that a motorist can completely and absolutely rely upon the directions of a flagman working on a construction job and be relieved entirely of the duty to otherwise use care for his own safety. The parties to these appeals apparently accept by analogy the standards of care required of one who seeks to cross a railroad track where a warning signal device is in use and we agree that they are applicable here. It is said in *Startup* v. *Pacific Elec. Ry. Co.*, 29 Cal.2d 866, 871 [180 P.2d 896]:

". . . The railroad tracks are, of course, themselves a warning of danger and a driver of an automobile must take some precautions for his safety when attempting to cross them, even though the railroad has installed some system to warn of approaching trains. (*Will* v. *Southern Pacific Co., supra,* [18 Cal.2d 468 (116 P.2d 44)]; *Toschi* v. *Christian, supra,* [24 Cal.2d 354 (149 P.2d 848)], at p. 360, et seq.) It is ordinarily a question for the jury whether the precautions taken by the driver of the automobile are sufficient in view of all of the

circumstances. (*Toschi* v. *Christian, supra,* at p. 360; *Koch* v. *Southern California Ry. Co., supra* [148 Cal. 677 (84 P. 176, 113 Am.St.Rep. 332, 7 Ann.Cas. 795, 4 L.R.A.N.S. 521)], at p. 680; *Will* v. *Southern Pacific Co., supra,* at p. 475.)''

While there were no tracks to serve as a warning in this case, there were other signs and evidence of unusual conditions apparent to appellant. In view of the uncontradicted evidence that appellant was not told that heavy trucks were being permitted to continue on to the bridge we do not hold that the failure to look was negligence as a matter of law that could not be excused. We think it clear, however, that appellant, like the motorist at the railroad track equipped with warning signals, should take into consideration the presence and information of the flagman and that, although this might under some circumstances afford an excuse or justification for the violation of a statute, it could not and did not relieve him of the duty to use reasonable care for his own safety.

Apparently accepting this idea of the law, appellant argues that the instruction had the effect of telling the jury to ''omit *all* consideration of the comments, instructions and motions of Lee'' in determining whether appellant was guilty of contributory negligence. We do not so construe it. The use of the word ''completely'' was used to convey the idea that appellant could not rely on the flagman alone and do nothing more to meet the standard of conduct that should be observed by a reasonably prudent man. It also indicated that in determining the question they should take the actions and words of the flagman into consideration with all the other facts in the case. There was no error in giving the instruction.

██ At the request of defendants Potter and Eudy this instruction was given:

''You are instructed that Section 544 of the Vehicle Code, which was in full force and effect at the time of the accident involved in this case, provides in part as follows:

'' '(a) No person shall turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided herein in the event any other vehicle may be affected by such movement.' ''

This was followed by instructions giving the provisions of sections 545 and 546 of the same code explaining the manner in which the signals should be given.

Appellant contends that these sections were not applicable for the reason that Boots was not making a turn at the time of the accident within the meaning of the sections. It is argued that "the situation was precisely the same as if Boots' pickup were proceeding around a curve in the same highway, or as if one highway had ended at that point and another highway continued on from that point at an angle."

This argument is based upon the assumption of a fact that did not exist. If a barricade or detour sign had been placed across the intersection, effectively warning all traffic that the main highway beyond the intersection was closed and directing all traffic to turn north, the contention might have some merit, but such was not the case. Each motorist at the time he approached the intersection could see three signs, each giving warning of construction work ahead, and cautioning him to drive carefully, but there was nothing to indicate in any way as he approched that any traffic was being diverted to the county road. Until he saw the flagman standing in the intersection there was nothing to indicate he should even stop or that he could not, if he drove carefully, proceed across the intersection to the bridge. If he stopped and the flagman talked to him he then learned, for the first time, that new conditions were being imposed. In view of the information given by Lee, if the motorist were the driver of a heavy truck, after stopping he would learn, for the first time, that there was water flowing over the bridge but that he might proceed across it. If he were the driver of a light vehicle, after stopping he would learn, for the first time, that he would have to make the detour by way of the county road, but, as in the case of Boots, would not learn that heavy trucks were being permitted to proceed to the bridge. The fact that Boots assumed it was the end of the road did not make it so as a matter of law.

As far as either kind of traffic was concerned, the situation did not change until the particular motorist was notified by the flagman. The code sections still applied, modified only by the possible application of the rules of excuse and justification for the violation of a statute hereinafter discussed in connection with another instruction.

At the request of Lee and Thomas Construction Company the court gave the following instruction:

"You are instructed that it is not only the duty of a motorist upon a public highway to keep such a vigilant lookout for other motorists who are lawfully using the highway as is re-

quired in the exercise of ordinary care, but it is also his duty to see that which may be seen by the use of ordinary care. It is as negligent to fail to see that which may be seen by the use of ordinary care as not to look at all.''

This was a statement of elementary law. (*Astone* v. *Old-field*, 67 Cal.App.2d 702 [155 P.2d 398]; *Bischell* v. *State*, 68 Cal.App.2d 557 [157 P.2d 41].) If appellant could not rely completely upon the flagman the first part of this instruction was clearly applicable in connection with the instructions concerning the giving of signals when turning. The last sentence was not applicable in view of the fact that appellant did not look at all, but it could not have been prejudicial.

In this connection appellant contends that the evidence discloses as a matter of law that the failure to give a signal could not have been a proximate cause of the accident. He states that ''at the time appellant started into the detour the Potter truck was so close and coming so fast that the accident could not have been avoided by any action on anyone's part at the time . . . When Mr. Boots started into the detour Potter's truck was then only 20 to 30 feet or one to two car lengths away.'' Potter testified that he saw the pickup long before he got that close and could have avoided the accident if he had seen the signal. With this evidence before it, the question was one for the jury.

Appellant also complains of the refusal to give the following instruction:

''If you find from the evidence that any failure by the plaintiff, Charles Boots, to give a signal did not contribute to the happening of this accident and that at the time the plaintiff, Charles Boots, began to turn onto the detour, the truck tractor and semi-trailer driven by the defendant, Virgil Potter, was not so close to the detour as to constitute an immediate danger if it were traveling at a reasonable rate of speed, then you must find that the plaintiff, Charles Boots, was not guilty of contributory negligence in the manner in which he turned into the detour.''

There was a conflict in the evidence as to the position and speed of the Potter truck when Boots started to turn, and this was a formula instruction which would have directed the jury to find that Boots had not been negligent ''in the manner in which he turned into the detour'' if *his failure to give a signal* did not contribute to the accident. It ignored other elements which might have justified a finding of contributory negligence such as failure to look before turning to ascertain

if other traffic constituted an immediate hazard. It was properly refused.

He also requested the following instruction, which was refused:

"You are instructed that the plaintiff, Charles Boots, was not required to signal his intention of turning into the detour for 50 feet before reaching the detour."

It is contended that the court "by implication" instructed the jury that Boots had to give the turning signal for 50 feet before reaching the detour and that this instruction was required to correct that implication. The instructions given on signaling did not include the statutory provision referred to. The evidence was uncontradicted that Boots gave the stop signal until after he had come to a full stop, and he could not have been expected to give a turning signal before he knew he had to turn. Moreover, inasmuch as the instructions given omitted all reference to the length of time the signals should be given there was no need to give the instruction requested. And if it can be successfully argued that such an instruction should have been given to prevent the jurors from applying their own knowledge of the motor vehicle laws in the instant case the error could not have been prejudicial for the reason that Boots gave no signal at all and did not look to see if one was necessary.

Appellant also complains of the refusal to give the following:

"If you find from the evidence that at the time of this accident the conduct of the plaintiff, Charles Boots, was excusable, justifiable and such as might reasonably have been expected from a person of ordinary prudence, then you must find that Charles Boots was not guilty of contributory negligence, even though you should also find that he violated a statute."

The instruction as offered was not a correct statement of law. It failed to state the effect of a violation in terms of the prima facie presumption of negligence and gave no instruction concerning the basis upon which a reasonably prudent man might be justified in failing to obey the statute. (*Satterlee* v. *Orange Glenn School Dist.*, 29 Cal.2d 581 [177 P.2d 279]; *Ornales* v. *Wigger*, 35 Cal.2d 474 [218 P.2d 531].)

Moreover, the instructions given by the court on this subject are more favorable to appellant than the instruction requested. The code sections were read, but nothing was said

about negligence as a matter of law or the effect of a violation. The jury was instructed generally on the subject of negligence and contributory negligence and informed that if appellant "would not reasonably have anticipated that a truck would be attempting to pass him on the left side of the highway at the place of the detour, then, the Plaintiff, Charles Boots, was not guilty of contributory negligence in failing to anticipate the presence of the truck." The effect of the instructions, considered as a whole, was to call the attention of the jury to the statutory requirements, and then to inform them that a violation would be of no consequence if under the circumstances appellant acted as a reasonably prudent man.

At the request of the defendants Lee and Thomas Construction Company the court gave the following instruction:

"You have heard reference in this case to the law of contributory negligence. Contributory negligence means negligence on the part of a Plaintiff proximately contributing to his own injuries or damages. Therefore, you are instructed in this case that before the Plaintiff Charles Boots may recover either for his own injuries or for the death of his wife, Mary B. Boots, *it must appear from the evidence that the injuries and damages suffered by him were proximately caused by negligence on the part of one or more of the Defendants, and its must not appear that such negligence was mixed with any negligence on the part of the Plaintiff Charles Boots proximately contributing thereto.* In other words, if any negligence on the part of Charles Boots contributed in any manner or degree, however slight, directly and proximately to the accident, he may not recover in this case." (Italics supplied.)

Appellant contends that the italicized portions of this instruction in effect placed upon him the burden of proving that he was not guilty of contributory negligence, and cites *Howard* v. *Worthington*, 50 Cal.App. 556 [195 P. 709], *Rush* v. *Lagomarsino*, 196 Cal. 308 [237 P. 1066], and *Bellows* v. *City & County of San Francisco*, 106 Cal.App.2d 57 [234 P.2d 729]. In the Howard case the instruction, after stating the rules concerning plaintiff's burden of proof, continued: "you must further find that the evidence shows, by a preponderance thereof, that the plaintiff was not guilty of negligence . . . " In the Rush case, after the preliminary statement on the burden of plaintiff's proof, the instruction read: "It must also appear to your satisfaction, that the plaintiff was without fault or negligence on his part which may in any wise have

contributed to the accident.'' In the Bellows case the court told the jury that ''before you can find a verdict in favor of plaintiff and against defendant, you must further find, from a preponderance of all the evidence, that plaintiff herself was not guilty of negligence proximately contributing to the happening of said accident.'' Such instructions were held to be erroneous. The instruction now under consideration does not have that effect, as it merely stated, ''and it must not appear that such negligence was mixed with any negligence on the part of the Plaintiff Charles Boots proximately contributing thereto.'' While we do not recommend this particular wording, when considered in the light of other instructions given on the subject it could not have been prejudicial.

Two other instructions were properly refused as they were merely negative statements of the rule as to burden of proof and were properly covered by other instructions given.

 Appellant requested the following instruction on the basic speed law, except the portion in italics, which was added by the court:

''In addition to the speed limit of 40 miles per hour, the driver of a truck tractor and semi-trailer must also comply with the basic speed law of this State. The basic speed law of this State is as follows:

'' 'No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent, having due regard for the traffic on, and the surface and width of the highway, and in no event at a speed which endangers the safety of persons or property.'

'' 'No person,' *that applies to both drivers of these vehicles.*''

It is now contended that this action of the court was prejudicial because there was no claim that Boots was driving too fast.

As requested by appellant, the second paragraph of the instruction used the wording of the code ''No person'' which applied to all parties and was subject to the same complaint. If the words added by the court had the effect of emphasizing the point they could have had no effect in view of the undisputed evidence that Boots was just starting in low gear when hit.

 At the request of Potter and Eudy the court gave this instruction:

''You are instructed that it would be a violation of your duty as Jurors to discuss the nature and extent of the Plain-

tiffs' damages, if any, until you shall have first determined the question of whether or not the Defendants are liable. The question of liability should first be determined by you before it would be proper for you to in any wise discuss the nature and extent of the Plaintiffs' damages, if any; because, unless the Defendants are liable, the nature and extent of the Plaintiffs' damages, if any, should not enter into your deliberations. In other words, you are first to determine whether or not the Defendants are liable. If so, then you will discuss the measure of damages, if any. If the Defendants are not liable, you should not consider the nature and extent of the Plaintiffs' damages, if any, at all.''

It is now argued that the extent of the injuries to Boots and his wife had a direct bearing on the questions of negligence, contributory negligence and proximate cause. In support of his contentions, appellant relies upon *Simmons* v. *Lamb*, 35 Cal.App.2d 109 [94 P.2d 814], and *Condon* v. *Ansaldi*, 203 Cal. 180 [263 P. 198], in which somewhat similar instructions were held to be erroneous under the circumstances of those cases but in which it was also pointed out that such an instruction would be proper under other conditions.

In the Simmons case the car of plaintiff, while proceeding in a dense fog, struck the rear end of a truck that had stopped. There was a dispute as to where the truck was parked and also a serious conflict as to who was driving the plaintiff's car, plaintiff herself or a young man who was claimed to have been intoxicated at the time. The injuries received by plaintiff could have had a direct bearing on the question as to where she was seated and as to who was driving and also as to the location of the truck. In the Condon case a pedestrian was struck by an automobile and there was great uncertainty as to how the accident happened. In the case now under consideration plaintiff did not sue for damages to his pickup and the instruction did not direct the jury to refrain from considering the question of damages to it but referred to the personal injuries only. Moreover, there was no uncertainty as to how the accident occurred. The evidence was undisputed that the Potter truck struck the pickup on the side while the truck was traveling at a speed of from 25 to 50 miles an hour, throwing the pickup truck 150 feet into the field on the northeast corner of the intersection and that after the accident the Potter truck traveled some 178 feet past the point of impact before it stopped, leaving skid marks of 41 feet before the impact and of 74 feet after the impact. The jury was permitted to consider the

photograph of the damaged pickup. The evidence was also undisputed that Boots started from a complete stop and drove directly across the highway in front of the approaching truck without looking to see if the highway was clear. Under these circumstances the giving of the instruction could not have prejudiced the right of appellant.

## The Appeals of Lee and Thomas Construction Company

Under the issues raised by the pleadings, if Thomas Construction Company is liable at all the liability must rest upon the doctrine of respondeat superior, and it is now contended that as a matter of law the evidence was insufficient to establish any negligence on the part of Lee.

Several questions are raised but only two need be discussed. First, it was contended at the trial that Lee was negligent in the manner in which he flagged and in failing to stand where he could see and control the traffic and appellants now argue that the evidence, including the photographs exhibited to the jury, demonstrated that he could not safely stand in a more advantageous position, or act otherwise. We do not have the photographs before us and we must, therefore, assume that the jury was warranted in finding that Lee was negligent on that ground, if that was the basis of their decision. ▮ Secondly, it was contended at the trial that Lee was negligent in not telling Boots that heavy traffic was not being detoured over the county road and it is now argued that he was under no duty to do so. Considering the situation that existed there, and the assumption of Boots, after listening to Lee, that all traffic was simply making a turn at the intersection, it is apparent that this was a vital fact in the case and it was a question for the jury to determine if a reasonably prudent man should have given the information under the circumstances and if the failure to do so was the proximate cause of the accident.

The judgments are affirmed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied February 25, 1954, and plaintiff and appellant's and defendants and appellants' petitions for a hearing by the Supreme Court were denied March 25, 1954. Carter, J., was of the opinion that the petition should be granted.